## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

ERIC D. EATON,

      Plaintiff,

v.                                                            Case No: 8:20-cv-0061-KKM-CPT

PRINCIPAL LIFE INSURANCE
COMPANY and PRINCIPAL NATIONAL
LIFE INSURANCE COMPANY,

      Defendants.

_____

### <u>ORDER</u>

Eric Eaton is a licensed securities broker. He worked as an agent for Principal Life Insurance Company and Principal National Life Insurance Company (collectively, Principal) beginning in 2001 until he terminated his agency contract with Principal in 2016. During that time, Eaton sold a specific kind of security for Principal, known as a Principal Variable Annuity (PVA). Eaton worked under the terms of two different agency contracts: his initial agency contract signed in 2001 and a new agency contract signed in 2009. In those contracts, Eaton agreed to a compensation package in exchange for his services. Commission schedules (updated annually) set out the terms of his compensation, which were incorporated by reference into Eaton's agency contracts. In October 2016,

Eaton terminated the 2009 agency contract with Principal. Following that termination, Principal stopped paying Eaton "trail commissions" on the PVAs that he sold during his time as a Principal agent.

Eaton sued Principal in response. In his complaint, he alleges that Principal breached its contracts with him by failing to continue paying him trail commissions following his termination on the PVAs he sold between July 2001 and October 2016. He alleges one claim for breach of contract and one claim for declaratory judgment. Principal responds that Eaton is not entitled to any post-termination trail commissions under the plain language of the applicable contracts and commission schedules. The facts in this action are largely undisputed; both parties agree that this case turns on the interpretation of certain key provisions in two agency contracts and the incorporated commission schedules.

Eaton moves for partial summary judgment, arguing that the Court should conclude as a matter of law that he is entitled to trail commissions for PVAs that he sold under each of his agency contracts. (Doc. 46.) His briefing is unclear as to why, given this argument, he seeks only *partial* summary judgment, but the Court assumes his arguments go to liability only and that he believes the damages calculation would require further resolution. Principal opposes Eaton's motion, (Doc. 55), and moves for summary judgment, arguing it is entitled to judgment as a matter of law because the clear language of the contract terms

bar the monetary and declaratory relief Eaton seeks, (Doc. 50). Eaton opposes that motion. (Doc. 53.)

Under the plain terms of the governing contracts, the Court concludes that Eaton is not entitled to the post-termination trail commissions he seeks. Of primary importance is the commission schedules' unambiguous disclaimer that "[t]rail commissions are not paid after your contract with us terminates." (Doc. 49-11 at 27.) Because that text—as well as the text of the 2001 and 2009 Agency Contracts—is clear, that is the end of the matter. *See* Antonin Scalia & Brian Garner, *Reading Law: The Interpretation of Legal Texts* § 2, at 56 (2012) (explaining the fundamental rule of interpretation that the words of the governing document "are of paramount concern, and what they convey, in their context, is what the text means."). The Court therefore grants summary judgment to Principal and denies it to Eaton.

## I.   BACKGROUND[1]

### A. Facts

Between 2001 and 2016, Eaton was an agent affiliated with Principal. (Doc. 1 ¶¶ 8, 17.) In July 2001, Eaton signed an exclusive agency contract with Principal (the 2001 Agency Contract), which required that Eaton sell only Principal products. (Doc. 49 at 2;

---

[1] The Court recounts the undisputed facts as contained in the record. To the extent facts are disputed or capable of multiple inferences, the Court construes the record in favor of the nonmovant. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1262 (11th Cir. 2020). Because the parties have filed cross motions for summary judgment, the Court views the facts in the light most favorable to the nonmoving party on each motion. *See James River Ins. Co. v. Ultratec Special Effects Inc*, 22 F.4th 1246, 1251 (11th Cir. 2022).

Doc. 49-3 at 3.) From July 2001 through December 2009, Eaton and Principal operated under the 2001 Agency Contract. (Doc. 51 at 1.) In December 2009, Eaton and Principal entered into a second agreement (the 2009 Agency Contract), which replaced the initial agreement as the operative contract. (*Id.* at 2.)

Under both agency contracts, Eaton sold PVAs, which are securities. (Doc. 1 ¶ 11.) To be legally eligible to sell them, service them, and receive commissions on them, an individual must be registered with a securities broker-dealer. (Doc. 49-2 at 5.)

Beginning in July 2001, Eaton registered with Princor Financial Services (Principal's affiliated broker-dealer) and executed a registered representative agreement with Princor. (*Id.* at 6–7; Doc. 49-6.) By operation of the agreement, Eaton became an "Associated Person" with Princor. That agreement between Eaton and Princor covered commissions paid on registered products, which expressly included PVAs. (Doc. 49 at 4–5; Doc. 49-6 at 1.)

Both Eaton's agency agreements (the 2001 Agency Contract and the 2009 Agency Contract) and his agreement with Princor incorporated separate commission schedules, which governed Eaton's compensation structure. (Doc. 49-3 at 2; Doc. 49-12 at 3.) These commission schedules covered a wide variety of products, including life insurance policies, disability income policies, and annuities. (*See, e.g.*, Doc. 49-7 at 3, 16, 20.) And within the annuities category, the commission schedule covered multiple annuity products—

including the PVAs at issue in this dispute. (*Id.* at 20–24.) Regarding the PVAs, the commission schedules provided a range of commission options and clarified that only "Registered Representatives" could sell the PVAs. (*Id.* at 21.)

**E. Flexible Variable Annuity\* Qualified and Non-Qualified** issued to Principal Life Insurance Company (may only be sold by Registered Representatives).

| | | Premium Up to $2,000,000 and Issue Age to 75 | | | Premium Over $2,000,000\*\* and Issue Age to 75 All Premium Amounts for Issue Ages 76-85 | |
| --- | --- | --- | --- | --- | --- | --- |
| | First Year Commission | Years 2 Thru 7 Annual Trail Commission\*\*\* | Years 8 and Later Annual Trail Commission\*\*\*\* | First Year Commission | Years 2 Thru 7 Annual Trail Commission\*\*\* | Years 8 and Later Annual Trail Commission\*\*\*\* |
| Option A | 3.5 | 0 | .20 | 2.5 | 0 | .20 |
| Option B | 3.0 | .10 | .30 | 2.0 | .10 | .30 |
| Option C | 2.0 | .30 | .50 | 1.0 | .30 | .50 |

(*Id.*) Each option provided a "First Year Commission" (new premium commissions) on the sale of a PVA followed by an "Annual Trail Commission." (*Id.*) Eaton selected an option that entitled him to payment of "trail commissions" on the PVAs that he sold beginning the eighth year the individual PVA contracts remained in force and every year thereafter. (Doc. 51 at 2–3.)

During his time as a Principal agent, Eaton sold PVAs on Principal's behalf and subsequently acted as a servicing agent for those PVAs according to his agreement with Principal and Princor. (Doc. 49-4 at 2–3; Doc. 49-2 at 18.) The arrangement worked this way: Principal paid commissions for the sale and servicing of the PVAs that Eaton sold to Princor, and Princor then compensated Eaton directly. (Doc. 49-4 at 2–3.)

New commission schedules were issued annually. (*Id.* at 3; *see, e.g.*, Doc. 49-7; Doc. 49-8; Doc. 49-9; Doc. 49-10; Doc. 49-11.) In 2009, Principal issued a revised Commission

Schedule for Career Agency Contracts. (Doc. 49-8.) In the 2009 Commission Schedule

and all subsequent commission schedules, Principal included the following language:

> Servicing agent means the agent appointed by us and accepted by the contract
> owner as the servicing agent. If the contract owner requests a change in the
> servicing agent or if we decide that change would be in the best interests of
> the contract owner, trail commissions will be paid to the new servicing agent.
> *Trail commissions are not paid after your contract with us terminates.*

(Doc. 49-8 at 19 (emphasis added); Doc. 49-9 at 21; Doc. 49-10 at 26; Doc. 49-11 at 27.)

Eaton's 2001 Agency Contract defined "commission" to mean "first year

commission, renewal commission, service fee, and bonuses identified in the commission

schedule." (Doc. 49-3 at 1.) The contract also included a section titled, "COMMISSIONS

WHILE UNDER CONTRACT," which provided: "We will pay you commissions on

policies sold according to the commission schedule and your financing plan, if any." (*Id.* at

2.) It included another a section titled "COMMISSIONS AFTER TERMINATION,"

which provided that certain commissions will be paid following contract termination (for

reasons other than death). (*Id.* at 2.) Specifically, that section mentions the payment of

"[f]irst [y]ear commissions not yet paid on deterred first year premiums" and "[f]ull renewal

commissions" on certain policies. (*Id.*) This section did not mention trail commissions.

Eaton's 2009 Agency Contract provided that prior contracts, including the 2001

Agency Contract, were "terminated." (Doc. 49-12 at 4.) It further stated that the "Agent's

rights to receive Commissions and service fees earned on any business issued under a

previous career agen[cy] contract will continue to be paid in accordance with the applicable commission schedule(s)." (*Id.*) As stated above, the commission schedule in effect at the time the 2009 Agency Contract became effective (and each subsequent commission schedule) stated that "[t]rail commissions" for PVAs "are not paid after your contract with us terminates." (Doc. 49-8 at 19.) The 2009 Agency Contract also included a section titled "COMMISSIONS AFTER TERMINATION," which provided that if the contract was terminated (for reasons other than death or fraud), Eaton would "receive Commissions as provided in the Commission schedule in effect at the time this Contract terminates." (Doc. 49-12 at 3.) The very next provision in that section addresses the post-termination situation where an agent "continuously held a career agen[cy] contract . . . previous to this Contract." (*Id.* at 4.) In that situation, the 2009 Agency Contract provided that "Commissions on Policies or additions to Policies sold while the previous career agency contract was in effect will be the greater of that determined under this Contract or any previous career agen[cy] contract." (*Id.*)

On October 18, 2016, Eaton voluntarily resigned as an agent of Principal and terminated his 2009 Agency Contract with Principal. (Doc. 1 ¶ 17; Doc. 49-2 at 11–12.) The parties agree that Eaton's contract was terminated "for reasons other than death or fraud." (Doc. 49-2 at 8–9.) The commission schedule in effect at that time was the August 2016 Commission Schedule. (Doc. 49-11.) That commission schedule—like every

7

schedule going back to 2009—included the language: "[t]rail commissions are not paid after your contract with us terminates." (*Id.* at 27.)

When Eaton terminated his agreement with Principal and Princor (his broker-dealer during his time at Principal), he was no longer an "Associated Person" of Princor. (Doc. 49-13 at 2.) Until Eaton registered with another broker-dealer, he could not service the PVAs he sold during his time as an agent of Principal. (Doc. 49-2 at 16; Doc. 49-4 at 4.)

On October 11, 2016, Eaton executed a representative agreement to join LPL Financial LLC, an independent registered broker-dealer. (Doc. 49-17.) Then, on October 24, Eaton entered into a new agreement with Principal—this time a broker contract, rather than an agency contract—so that he could continue selling Principal products. (Doc. 49-19.) By virtue of his new contract with LPL, Eaton was again an "Associated Person" of a registered broker-dealer. (Doc. 49-2 at 12–13; Doc. 49-4 at 5.) Eaton then transferred the PVAs at issue to LPL; this included changing the broker/dealer of record from Princor to LPL. (Doc. 49 at 12–13.) Under the terms of a separate agreement between LPL and Principal, LPL and its representatives could not sell any new PVAs but "they are allowed to service any existing" PVA contracts. (Doc. 49-23 at 1; Doc. 49-4 at 6.) As to compensation for the servicing of already-existing PVAs, the agreement between Principal and LPL contemplates specifically that "[t]he trail commission is paid to the current

servicing agent of record provided the Annuity Contract is still in effect." (Doc. 49 at 18.) Because LPL had a pre-existing annuity distribution agreement with Principal, it could receive trail commissions from Principal and pay Eaton a portion of trail commissions once he became a registered representative with LPL. (Doc. 49-2 at 20–21.) Principal is currently paying trail commissions to Eaton through LPL. (Doc. 49-2 at 3; Doc. 49-4 at 7.)

### B. Procedural History

Eaton brought this action against Principal seeking monetary and declaratory relief based on the unpaid post-termination trail commissions for the PVAs he sold during his time as an agent of Principal. (Doc. 1.) In his Complaint, Eaton brings two claims: breach of contract and declaratory judgment. (*Id.*) Principal, in turn, brought a counterclaim against Eaton for attorney's fees and costs. (Doc. 19.)

Eaton moves for partial summary judgment on his entitlement to trail commissions. (Doc. 46.) Principal moves for summary judgment on both counts, arguing that neither the 2001 nor the 2009 Agency Contract provide for trail commissions after Eaton's termination. (Doc. 50.)

## II.   LEGAL STANDARD

Summary judgment is appropriate if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is

material if it might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A moving party is entitled to summary judgment when the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant always bears the initial burden of informing the district court of the basis for its motion and identifying those parts of the record that demonstrate an absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

When that burden is met, the burden shifts to the nonmovant to demonstrate that there is a genuine issue of material fact, which precludes summary judgment. *Id.* at 607–08. The nonmoving party must "go beyond the pleadings" and point to evidence in the record that demonstrates the existence of a genuine issue for trial. *Celotex*, 477 U.S. at 324. The Court reviews all the record evidence and draws all legitimate inferences in the nonmoving party's favor. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1262 (11th Cir. 2020).

## III.   ANALYSIS

Because the parties move for summary judgment on the same issues, agree on the material facts underlying this dispute, and ask for judgment as a matter of law, the Court addresses the motions together.

The agency contracts at the center of this dispute both contain choice-of-law provisions requiring that courts apply Iowa law when interpreting the contracts. (Doc. 49-12 at 7; Doc. 49-3 at 4; Doc. 15 at 7; Doc. 50 at 6); *see Am. Fam. Life Assurance Co. of Columbus, Ga. v. U.S. Fire Co.*, 885 F.2d 826, 830 (11th Cir. 1989) (the forum state's choice-of-law rules determine what state's substantive law applies); *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1341 (11th Cir. 2005) (per curiam) (Florida enforces choice-of-law provisions absent contravening public policy); *accord Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 311 (Fla. 2000).

To succeed on a breach of contract claim under Iowa law, Eaton must prove (1) the existence of a contract between himself and Principal, (2) the contract's terms and conditions, (3) that Eaton performed all the terms and conditions required by the contract, (4) that Principal breached the contract, and (5) that Eaton suffered damages because of the breach. *See Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998). Eaton's declaratory judgment claim is derivative of his breach of contract claim—if the latter fails, so does the former. *See Peng v. Mastroianni*, No. 20-80102-civ, 2020 WL 11564646, at *5 (S.D. Fla. Oct. 26, 2020) (Singhal, J.). Therefore, the Court analyzes Eaton's claims together.

Where, as here, there are no disputes of material fact concerning the terms of the relevant contracts, summary judgment is particularly appropriate. *See Kohlheim v. Glynn*

*Cnty.*, 915 F.2d 1473, 1480 n.33 (11th Cir. 1990); *accord Margeson v. Artis*, 776 N.W.2d 652, 659 (Iowa 2009). The "cardinal rule of contract interpretation is the determination of the intent of the parties at the time they entered into the contract." *Homeland Energy Sols., LLC v. Retterath*, 938 N.W.2d 664, 687 (Iowa 2020) (quotation omitted). "If the intent of the parties is clear and unambiguous from the words of the contract itself, [courts] will enforce the contract as written." *DuTrac Cmty. Credit Union v. Radiology Grp. Real Est., L.C.*, 891 N.W.2d 210, 216 (Iowa 2017); *see also Peak v. Adams*, 799 N.W.2d 535, 543 (Iowa 2011). A clear contract term does not become ambiguous merely because the parties disagree about it. *See Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999); *see also Elbow Lake Coop. Grain Co. v. Commodity Credit Corp.*, 251 F.2d 633, 637 (8th Cir. 1958) ("The rules of contract construction should not be permitted to create ambiguity where none exists or to change or twist the plain meaning of a simple agreement.")

The central issue in this action is whether Eaton is entitled to post-termination trail commissions on PVAs that he sold while he worked as an agent for Principal between 2001 and 2016. Because the 2001 and 2009 Agency Contracts use different language concerning post-termination trail commissions and incorporate different commission schedules, the Court addresses them separately.

### A. Eaton is Not Entitled to Trail Commissions for PVAs that He Sold Under the 2009 Agency Contract

Principal argues that the Court should grant it summary judgment as to Eaton's breach of contract and declaratory judgment claims because the 2009 Agency Contract, which replaced the 2001 Agency Contract, never provided for trail commissions post-termination. Not only did it not provide for trail commissions, the relevant commission schedule barred them: "Trail commissions are not paid after your contract with us terminates." (Doc. 50 at 7–11.) Principal argues that there "could be no clearer statement of intent than this language." (*Id.* at 11.)

Eaton responds that no agent "in his or her right mind would elect to defer commission compensation for more than a few years (certainly not more than year eight and later) if he or she knew that trail commissions would be 'left on the table' after the registered representative departed Principal." (Doc. 53 at 5.) Eaton relies on the interpretive canon that specific language should control over general language and contends that the most specific contract provision addressing the issue is found in the 2009 Agency Contract, which states that "[t]he trail commission is paid to the current servicing agent of record." (*Id.* at 11.)

The Court agrees with Principal that Eaton is not entitled to trail commissions on PVAs he sold under the 2009 Agency Contract for three reasons. First, the "unambiguous . . . words of the contract" support Principal's position and contradict Eaton's. *DuTrac*,

13

891 N.W.2d at 216. The 2009 Agency Contract contains a section specifically addressing "COMMISSIONS AFTER TERMINATION," which provides that if the contract is terminated (for reasons other than death or fraud), Eaton would "receive Commissions as provided in the Commission schedule in effect at the time this Contract terminates." (Doc. 49-12 at 3.) The parties agree that Eaton terminated the 2009 Agency Contract in October 2016 for reasons other than death or fraud. (Doc. 49-2 at 8–9.) And there is no dispute that the commission schedule "in effect" at that time was the August 2016 Commission Schedule. (Doc. 49-11.) That commission schedule, like all the schedules going back to the January 2009 Commissions Schedule, clearly states that "[t]rail commissions *are not paid* after your contract with us terminates." (49-11 at 27 (emphasis added).) This provision governs the instant situation—Principal does not pay trail commissions following the termination of an agency contract.

Eaton fails to offer another reading of this provision and falls back on the assertion that no "right thinking agent" would agree to a contract with this term. (Doc. 53 at 10.) Whether it is a prudent contract term or not is immaterial to the question before this Court. Eaton's unsupported assertion about his (and other hypothetical agents' intentions) cannot override the governing contract's clear language. *See Homeland Energy*, 938 N.W.2d at 687 ("The language the parties used is the most important evidence of their intentions, and therefore, [the court] endeavor[s] to give effect to all language in the contract.").

14

Second, the interpretative canons support Principal's position and undermine Eaton's. Both parties acknowledge the well-accepted interpretative principle that "special or specific provisions in a contract control over general ones." (Doc. 53 at 11; Doc. 50 at 13). More importantly, Iowa acknowledges it. *See Homeland*, 938 N.W.2d at 688; *accord Iowa Fuel & Mins., Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 863 (Iowa 1991) ("[W]hen a contract contains both general and specific provisions on a particular issue, the specific provisions are controlling."). But the parties disagree about which provisions are general and which are specific and thus which one controls here. Under the heading "COMMISSIONS AFTER TERMINATION," the 2009 Agency Contract stated that Eaton would "receive Commissions as provided in the Commission schedule in effect at the time this Contract terminates." (Doc. 49-12 at 3.) And in the 2016 Commission Schedule, within the section titled "PRINCIPAL PIVOT SERIES VARIABLE ANNUITY" and subtitled "Commissions on Premium," the schedule stated that "the trail commission is paid to the current servicing agent of record." (Doc. 49-11 at 44.)

Eaton attempts to create ambiguity as to the meaning of the trail-commissions-are-not-paid-after-termination term by arguing that the more specific term governing these facts is the term in the 2016 Commission Schedule discussing the payment of trail commissions to the "current servicing agent of record." (Doc. 53 at 8–10.) This argument is not persuasive because Eaton fails to explain why that provision is more specifically

applicable to this dispute than the term "[t]rail commissions are not paid after your contract with us terminates." (Doc. 49-11 at 27.) It is undisputed that the operative commission schedule stated that "[t]rail commissions are not paid after your contract with us terminates." (Doc. 49-11 at 27.) This term is directly applicable to the facts here. In contrast, Eaton's preferred term that he claims is more specific (i.e., "trial commission is paid to the current servicing agent of record") does not address how commissions are paid after termination of the contract. The general/specific canon supports Principal's position.

Further, Iowa follows the universally accepted interpretive canon that Courts should prefer interpretations that give effect to the text as a whole and do not render any provisions "unreasonable, unlawful, or of no effect." *Fashion Fabrics of Iowa v. Retail Invs. Corp.*, 266 N.W.2d 22, 26 (Iowa 1978); *accord McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 406 (1819) (Marshall, C.J.) (calling for "a fair construction of the whole instrument."). Any suggested reading of the operative contract language here should, if possible, account for all the terms in the contract. Eaton fails to suggest an alternate reading of the trail-commissions-are-not-paid-after-termination term; instead, he seems to ask this Court to read it out of the contract. The Court declines to do so.

Third, Iowa law is clear that mere disagreement about a contract term is not enough to create ambiguity as to an otherwise clear term. *See Hartig*, 602 N.W.2d at 797. The question of whether ambiguity exists in a written contract is a matter of law for the court.

*Id.* (citing 17A Am. Jur. 2d *Contracts* § 339 (1991)). Eaton disagrees with Principal's suggested interpretation of the operative provision that "[t]rail commissions are not paid after your contract with us terminates." Principal argues that it applies directly to this situation because Eaton terminated his contract with Principal and is now asking for trail commissions, which are expressly disallowed by the applicable contract provision. (Doc. 49-11 at 27.) Eaton fails to offer up another way to read it, likely because there is not one.

After considering the applicable rules of interpretation as required under Iowa law, this Court concludes that, under the clear language in the 2009 Agency Contract and the operative August 2016 Commission Schedule, Eaton is not entitled to trail commissions on PVAs that he sold after 2009.

## B. Eaton is Not Entitled to Trail Commissions on PVAs that He Sold Under the 2001 Agency Contract

Principal argues that the Court should grant it summary judgment as to Eaton's breach of contract and declaratory judgment claims because the 2001 Agency Contract and applicable commission schedules never provided "for the continued payment of trail commissions for PVAs following termination." (Doc. 55 at 10–11.) Principal acknowledges section 6(a)(2) of the 2009 Agency Contract (which replaced the 2001 Agency Contract). That section states that "Commissions on Policies or additions to Policies sold while the previous career agen[cy] contract was in effect will be the greater of that determined under this Contract or any previous career agen[cy] contract." (Doc. 49-

17

12 at 4.) And Principal affirms that it agreed to pay *certain* commissions after termination under the 2001 Agency Contract but argues that it did not agree to pay *trail* commissions on PVAs. It highlights that the 2001 Agency Contract does not include trail commissions among the specific types of commissions listed in the section titled "COMMISSIONS AFTER TERMINATION." (Doc. 55 at 10–12.)

Eaton, in his turn, argues that he is entitled to partial summary judgment as to the PVAs that he sold under the 2001 Agency Contract because that agreement did not include or incorporate the express provision found in later commission schedules disallowing trail commissions "after your contract with us terminates." (Doc. 46 at 5.) Eaton rightly notes that this term was first included in the January 2009 Commission Schedule. (*Id.*; Doc. 49-8 at 19.) Eaton also points to section 6(a)(2) of the 2009 Agency Contract to support the point that "Principal agreed to pay commissions after an agent's contract terminated pursuant to the prior version of the career agen[cy] contract." (Doc. 46 at 7.) Eaton concludes by arguing that there is no contractual language that in any way superseded or otherwise modified his right to be paid trail commissions on PVAs he sold under the 2001 Agency Contract following termination. (*Id.*)

The Court again agrees with Principal's interpretation and disagrees with Eaton's. Eaton is correct that there is no express provision disallowing trail commissions after termination for the PVAs that he sold under the 2001 Agency Contract. But his argument

assumes that the 2001 Agency Contract affirmatively granted him the right to post-termination trail commissions for PVAs. It did not. Although Principal agreed to pay *certain* post-termination commissions under the 2001 Agency Contract, nothing in the 2001 Agency Contract or the relevant incorporated commission schedules reveals that Principal agreed to pay *trail* commissions on PVAs post termination.

Several features of the 2001 Agency Contract deserve discussion. In its definition section, the 2001 Agency Contract contemplates several different types of commissions, including "first year commission[s], renewal commission[s], service fee[s], and bonuses identified in the commission schedule." (Doc. 49-3 at 1.) It does not expressly contemplate trail commissions in the definition section or define "renewal commissions" to include "trail commissions." Additionally, like the 2009 Agency Contract, the 2001 Agency Contract stated that commissions will be paid "according to the commission schedule." (Doc. 49-3 at 2.) Further, the 2001 Agency Contract contained a section titled "COMMISSIONS AFTER TERMINATION," which provided that certain commissions will be paid following contract termination (for reasons other than death). (*Id.*) Specifically, it promised payment of "[f]irst [y]ear commissions not yet paid on deterred first year premiums" and "[f]ull renewal commissions" on certain policies. (*Id.*) That section did not discuss, much less bind Principal to paying, trail commissions after termination.

Like the later commission schedules discussed above, the commission schedules incorporated by the 2001 Agency Contract also provided for the payment of "trail commissions." (*See, e.g.*, Doc. 49-7 at 21.) But unlike the later commission schedules, the earlier schedules do not directly address how termination affects the payment of trail commissions. (*But see, e.g.*, Doc. 49-11 at 27.) Thus, the provision in the 2001 Agency Contract that directly addressed "COMMISSIONS AFTER TERMINATION" is critical, as it is the provision that could give rise to post-termination payments of trail commissions through section 6(a)(2) of the 2009 Agency Contract. (Doc. 49-3 at 2–3.) That provision expressly provided for the payment of "[f]irst [y]ear commissions not yet paid on deterred first year premiums" and "[f]ull renewal commissions"; it does not provide for the payment of trail commissions. To "express or include" certain types of commissions "implies the exclusion of" other alternative kinds not included. *Expressio Unius Est Exclusio Alterius*, Black's Law Dictionary (11th ed. 2019); *see Maytag Co. v. Alward*, 112 N.W.2d 654, 656 (Iowa 1962) (applying the interpretive principle to contract interpretation); *cf. Staff Mgmt. v. Jiminez*, 839 N.W.2d 640, 649 (Iowa 2013) ("[I]ntent is expressed by omission as well as inclusion, and the express mention of one thing implies the exclusion of others not so mentioned." (quoting *Meinders v. Dunkerton Cmty. Sch. Dist.*, 645 N.W.2d 632, 637 (Iowa 2002))). Again, the "pertinent rules of interpretation" cut in favor of Principal and against Eaton. *See Hartig*, 602 N.W.2d at 797.

20

Attempting to create ambiguity, Eaton argues that the term "renewal commissions"—which are provided for post termination in the 2001 Agency Contract—should be read to include "trail commissions." (Doc. 46 at 13–14.) But reading the two terms in the light of the entire 2001 Commission Schedule belies this claim. *See Iowa Fuel & Mins.*, 471 N.W.2d at 863 (noting that particular words and phrases in a contract should not be interpreted in isolation). There is nothing in the 2001 Commission Schedule that associates "renewal commissions" with "trail commissions." (*See generally* Doc. 49-7.) The two terms are never mentioned in the same section. (*Compare* Doc. 49-7 at 3–19 (discussing renewal commissions), *with id.* at 21 (discussing trail commissions).). And the two terms are discussed without reference or relation to one another. Further, the formulas provided to calculate "renewal commissions" and "trail commissions" are separate and distinct, (*id.* at 16, 21), which leads this Court to conclude that the two terms are not interchangeable.

Finally, to the extent any ambiguity remains and reference to extrinsic evidence is permitted, Eaton's arguments still fail. *See Hartig*, 602 N.W.2d at 797 ("[E]xtrinsic evidence can be considered to help determine the intent."). It is undisputed that when Eaton terminated his then-operative agency contract with Principal in October 2016, he also terminated his agreement with Princor (his broker-dealer at that time) and ceased to be an "Associated Person." (Doc. 49 at 6, 9.) And under the governing regulations set down

by the Financial Industry Regulatory Authority (FINRA), Principal was legally unable to pay Eaton direct commissions on the PVAs at this point given that he was not registered with a broker-dealer until he consummated his agreement with LPL, his subsequent broker dealer. (Doc. 49-2 at 20 (Eaton noting his switch to LPL as his broker-dealer); Doc. 49-4 at 6–7); *see Payments to Unregistered Persons*, FINRA, https://www.finra.org/rules-guidance/rulebooks/finra-rules/2040 (last visited Mar. 30, 2020) ("No member or associated person shall, directly or indirectly, pay any . . . commissions or other allowances to . . . any person that is not registered as a broker-dealer . . . or any appropriately registered associated person."). Subsequently, as Principal notes, it resumed its payment of trail commissions to Eaton under Principal's agreement with LPL. (Doc. 50 at 10 n.2; Doc. 49-23.) But these later events—concerning his broker contract—are irrelevant to the dispute over whether Eaton is entitled to post-termination commissions on the PVAs he sold under his agency contracts with Principal.

Because the 2001 Agency Contract identified a list of specific commissions that continued after termination but did not include trail commissions for the sale of variable annuities in that list, Eaton is not entitled to post-termination trail commissions on PVAs that he sold under the 2001 Agency Contract either.

### C. Attorney's Fees and Costs

The only unresolved issue is Principal's counterclaim for attorney's fees and costs. (Doc. 19 at 11.) The parties' contract provides that if an agent sues Principal to "enforce the terms of this Contract, [the agent] will be responsible for paying all of [Principal's] costs and attorney fees" if the agent is unsuccessful. (Doc. 49-12 at 4.)

Since neither party briefed the issue nor requested judgment on this issue, the Court directs Principal—as the prevailing party—to file a motion under Local Rule 7.01 to determine its entitlement to attorney's fees.

## IV.   CONCLUSION

In the end, the Court agrees with Principal's reading of the governing documents and disagrees with Eaton's. The Court first concludes that Eaton is not entitled to trail commissions for PVAs that he sold under the 2009 Agency Contract based on the clear provision contained in the incorporated commission schedule that "[t]rail commissions are not paid after your contract with us terminates." (Doc. 49-11 at 27.) The Court further concludes that Eaton is not entitled to trail commissions for PVAs that he sold before 2009 under the 2001 Agency Contract because that agreement did not include payment for trail commissions. Thus, Eaton fails to identify any contract language entitling him to trail commissions from Principal.

Accordingly, the following is **ORDERED:**

1.    Plaintiff's Motion for Partial Summary Judgment (Doc. 46) is **DENIED**.

2.    Defendants' Motion for Summary Judgment (Doc. 50) is **GRANTED**.

3.    The Court directs Principal to file a motion under Local Rule 7.01 to
determine its entitlement to attorney's fees by **April 14, 2022**.

**ORDERED** in Tampa, Florida, on March 31, 2022.

*Kathryn Kimball Mizelle*

Kathryn Kimball Mizelle
United States District Judge

24